UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HERMAN DUNCAN,                    :
                                  :CIVIL ACTION NO. 3:16-CV-1398
        Plaintiff,                :
                                  :(JUDGE CONABOY)
        v.                        :
                                  :
CAROLYN W. COLVIN,                :
Acting Commissioner of           :
Social Security,                  :
                                  :
        Defendant.                :
                                  :

---

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") and Supplemental Security Income ("SSI") under Title XIV of the Act, 42 U.S.C. §§ 401-433.  (Doc. 1.)  He alleged disability beginning on August 7, 2011, and later amended the onset date to June 13, 2012.  (R. 21.) The Administrative Law Judge ("ALJ") who evaluated the claim, Nadine Overton, concluded in her April 17, 2015, decision that Plaintiff had the severe impairments of post-laminectomy syndrome, depression, and marijuana abuse, and the non-severe impairments of degenerative disc disease of the lumbar spine, cervical radiculopathy, and hypertension, which did not alone or in combination meet or equal a listing.  (R. 23-26.)  She also found that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain nonexertional limitations and that he was capable of performing jobs that existed in significant

numbers in the national economy.  (R. 26-31.)  ALJ Overton
therefore found Plaintiff was not disabled from June 13, 2012,
through the date of the decision.  (R. 32.)

With this action, Plaintiff asserts that the Acting
Commissioner's decision should be reversed or remanded for the
following reasons: 1) the ALJ improperly discounted opinions by
treating and examining physicians and gave undue weight to opinions
of a non-examining reviewer; 2) the ALJ failed to consider evidence
of impairment; and 3) the ALJ's RFC assessment and hypothetical
question to the vocational expert did not include all of the
limitations established by the evidence and, therefore, her
conclusion that there is work Plaintiff can do is not supported by
substantial evidence.  (Doc. 12 at 1.)  After careful review of the
record and the parties' filings, the Court concludes this appeal is
properly granted.

## I. Background

### A.   *Procedural Background*

Plaintiff protectively filed for DIB and SSI on October 23,
2012. (R. 21.)  The claims were initially denied on December 19,
2012, and Plaintiff filed a request for a hearing before an ALJ on
February 6, 2013.  (*Id.*)

ALJ Overton held a hearing on December 11, 2014, in
Harrisburg, Pennsylvania.  (*Id.*)  Plaintiff, who was represented by
an attorney, appeared at the hearing as did Vocational Expert

2

("VE") Rabia Rosen.  (*Id.*)  As noted above, the ALJ issued her unfavorable decision on April 17, 2015, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 32.)

Plaintiff's request for review of the ALJ's decision was dated May 15, 2015.  (R. 15-17.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on May 17, 2016.  (R. 1-7.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On July 6, 2016, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on September 8, 2016.  (Docs. 10, 11.)  Plaintiff filed his supporting brief on October 14, 2016.  (Doc. 12.)  Defendant filed her brief on November 16, 2016.  (Doc. 13.)  Plaintiff filed a reply brief on November 29, 2016.  (Doc. 14.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on August 20, 1967, and was forty-four years old on his amended onset date.  (R. 31.)  He participated in special education classes and completed tenth grade.  (Doc. 12 at 2.)  The VE classified Plaintiff's past relevant work as "janitorial/maintenance/house cleaning."  (R. 31.)

1.  **Physical Impairment Evidence**[1]

As set out in Plaintiff's brief, Plaintiff

> suffered a broken neck when he was knocked
> off an eight foot scaffolding a the Reading
> Fairgrounds on August 8, 2011 (R. 340, 345,
> 394, 399, 412, 431-435, 479).  CT of the
> cervical spine on September 27, 2011 showed
> progressive malalignment and unstable
> fracture at C6-7 (R. 412).  He underwent
> anterior cervical fusion with insertion of a
> metal cage and plate on October 14, 2011 (R.
> 340-346, 394-397).  Exams on January 19,
> 2012, February 2, 2012, June 5, 2012, June
> 20, 2012, October 4, 2012, October 9, 2013,
> December 17, 2013 and February 14, 2014
> revealed decreased range of motion of the
> neck (R. 352, 354, 356, 358-359, 363, 467,
> 478, 560).  CT of the cervical spine on March
> 30, 2012 shows metal fixation plate in place
> and C5-6 broad based disc bulge (R. 364,
> 389).  On May 15, 2014 Glenn Miller, M.D., of
> Spinal Care Pain Associates lists post-
> laminectomy syndrome and herniated nucleus
> pulposus (HNP) as diagnoses (Tr. 481).  Dr.
> Miller gave Duncan a series of cervical
> steroid block injections for pain (R. 474-
> 477, 481-483, 541-543).  Duncan was treated
> for low back and leg pain by ChesPenn Family
> Practice, spine surgeon Richard Close, M.D.,
> and Premier Orthopedics with findings on exam
> of positive straight leg raise, decreased
> range of motion of the lumbar spine with
> tenderness on palpation (R. 378, 436-440,
> 449-452, 485-495).  X-ray of the lumbar spine
> on October 10, 2012 shows degenerative
> changes (R. 386).

(Doc. 12 at 5-6.)

---

[1]  Because Plaintiff's claimed errors focus on his mental
impairments, Defendant also focuses on these problems in the
background section of her brief.  (Doc. 13 at 3 n.2.)  Therefore,
the "Physical Impairment Evidence" section of this Memorandum
recites physical impairment evidence set out in Plaintiff's brief.
(Doc. 12 at 5-6.)

2.   **Mental Impairment Evidence and Evaluations**

When Plaintiff was hospitalized for the cervical fusion in October of 2011, the "Review of Systems" was positive for depression and "Social History" notes indicate the Plaintiff was living in a recovery house for drug and alcohol "with a great deal of success, sober x10-1/2 months" and he was not working secondary to his injury.  (R. 340.)  The hospitalist consultant's "Assessment and Plan" states that Plaintiff's depression was well controlled as an outpatient and his dose of Seroquel would be continued.   (R. 342.)  The hospitalist recorded that Plaintiff was being seen in the postanesthesia care unit ("PACU") and he was anxious and agitated about being there in that he preferred more privacy. (*Id.*)  Records further indicated that Plaintiff was somewhat calmed when informed of the importance of the close monitoring provided in the PACU.  (R. 343.)

At his visit with Lazaro Pepen, M.D., a family practice physician, on January 19, 2012, Plaintiff was seen for follow up of hypertension and neck pain. (R. 358-59.)  Review of Systems ("ROS") was negative for depression and anxiety/panic.  (R. 359.)  In June 2012, ROS was negative for depression, anxiety/panic, mood disturbances, lack of sleep and lack of interest.  (R. 353, 354, 355.)  At the three visits in June, the following psychiatric examination findings were recorded: "Negative for Flat Affect and Memory.  No depression.  Not anxious."  (R. 352, 354, 356).  On

5

October 4, 2012, Dr. Pepen's notes indicated that Plaintiff was seen for medication refills and he had "no complaint." (R. 350.)

In November 2012, Plaintiff was seen at ChesPenn Family Health Center at Coatesville by Kevin McCabe, D.O. (R. 446.) The "Visit Type" was identified as "Consult" and the "History of Present Illness" was identified as a medical history of hypertension which had been controlled by medication but he had run out several weeks earlier. (*Id.*) No mental health problems were reported. (R. 446-49.)

On December 3, 2012, Jeffrey Bryer, Ed.D., conducted a Clinical Psychological Disability Evaluation. (R. 419-24.) Dr. Bryer commented that Plaintiff arrived on time for the evaluation, he was appropriately dressed, and he manifested appropriate social graces. (R. 419.) Plaintiff said he had depression for many years and had treated for it over the preceding six or seven years, including seeing a psychiatrist in Reading, Pennsylvania, up until about six weeks before the evaluation when he moved to Coatesville. (R. 420-21.) He added that he had an appointment the following week with the local community health center and he could not recall the antidepressant he had been taking. (R. 421.) He said he had attempted suicide in 2005 and was hospitalized at the Chester Crozier Psychiatric Unit. (R. 421.) Plaintiff added that this was his only suicide attempt. (*Id.*) The evaluation report is primarily historical narrative and includes the notations that

6

Plaintiff has a difficult time controlling his anger and violent feelings at times, he had trouble sleeping because he was bothered by nightmares related to his depression which made him angry, and he expressed homicidal ideation during difficult times.  (R. 422.) Dr. Bryer observed that Plaintiff's speech content and verbal communication skills were both unremarkable, Plaintiff was significantly depressed, but not homicidal or suicidal at the time, he sometimes had hallucinations involving hearing his name being called, he became paranoid at times, he was generally able to do serial 7's, he was oriented to time, he had disrupted short and long term memory (because he described himself as "not sure"), and he had poor impulse control.  (R. 422-23.)  Dr. Bryer also noted that a number of aspects of his clinical presentation raised the question of whether he was dealing with cognitive impairment secondary to childhood brain injury and exacerbated by his 2011 broken neck.  (R. 423.)  Dr. Bryer diagnosed that Plaintiff had "major depression, recurrent, moderate to severe intensity" as well as alcohol abuse in full remission, marijuana use in partial remission, and cognitive impairment and intermittent explosive disorder should be ruled out.  (R. 424.)

Also on December 3, 2012, Dr. Bryer completed a Medical Source Statement of Ability To Do Work-related Activities (Mental).  (R. 416-18.)  He found Plaintiff had marked limitations in several areas, including his ability to understand and remember short,

7

simple instructions, understand, remember and carry out detailed
instructions, and make judgments on simple work-related decisions.
(R. 417.)  Dr. Bryer identified the following medical/clinical
findings supporting the assessment: "Dep, status post broken neck
also childhood injury, HTN, substance abuse."  (*Id.*)  He also found
that Plaintiff had marked limitations in his ability to interact
appropriately with the public, supervisors and coworkers, and
respond appropriately to changes in a routine work setting, as well
as an extreme limitation in his ability to respond appropriately to
work pressures in a routine work setting.  (Id.)  Dr. Bryer did not
identify any medical/clinical findings in support of these
assessments.  (*Id.*)

At his December 10, 2012, follow-up visit with Dr. McCabe,
Plaintiff had new neck and right leg pain but no complaints of
mental health problems.  (R. 449-52.)

On December 12, 2012, Mark Hite, Ed.D., a state agency
consultant, reviewed the evidence and completed a Mental Residual
Functional Capacity Assessment.  (R. 104.)  He found that Plaintiff
was moderately limited in his ability to understand and remember
detailed instructions, explaining that Plaintiff's basic memory
processes were adequate and he was able to understand and remember
simple, routine instructions and carry them out.  (*Id.*)  He also
found that Plaintiff was moderately limited in his ability to carry
out detailed instructions, providing the additional explanation

that Plaintiff was able to maintain attention and concentration for extended periods of time for simple routine tasks.  (R. 105.) Regarding social interactions, Dr. Hite opined that Plaintiff was moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*)  Dr. Hite noted that the social interaction limitations were based on a history of anti-social behavior with multiple incarcerations but he presented to the consultative examiner in a socially appropriate manner.  (*Id.*)  Dr. Hite viewed Dr. Bryer's report as an overestimate of the severity of Plaintiff's impairments "with inconsistencies contained internally and with other evidence."  (R. 106.)

On January 10, 2013, Plaintiff had another follow-up visit with Dr. McCabe.  (R. 443.)  The office notes do not indicate that Plaintiff reported mental health related symptoms or issues or that Dr. McCabe recorded any discussion of mental health issues or examination findings.  However, "psychiatric disorder" was identified as a problem along with hypertension.  (R. 443-45.)  Dr. McCabe noted that Plaintiff would "followup with psych" and then return to the clinic with names of medications if new ones were started.  (R. 445.)  Dr. McCabe further noted that he would "hold off on starting new meds as patient has been off and relatively

stable for 4 months." (*Id.*)  The plan was to follow up in one month after psych evaluation.  (*Id.*)

Dr. McCabe saw Plaintiff again on February 8, 2013.  (R. 438.) Plaintiff reported compliance with blood pressure medications and said he had no other complaints.  (*Id.*)  No mental health problems were noted and the "psychiatric disorder" identified as a problem in January was not mentioned.  (*See* R. 438-40.)

Plaintiff was seen at NHS Human Services on August 12, 2013. (R. 453.)  Presenting problems were recorded to be "[d]epression started age 21 due to deaths in family, on/off depression, lack of motivation, no interest in activities, poor sleep, poor appetite, irritable, mood swings."  (R. 453.)  Plaintiff's symptoms were excessive worry and panic attacks in the past and he had auditory hallucinations ("just my name that's it") which started in the 1990's.  (*Id.*)  "Current Stressors" included the notation that Plaintiff was unemployed and was seeking Social Security disability, he had a history of construction work, and had broken his neck the previous year.  (*Id.*)  Plaintiff identified his previous mental health treatment to be inpatient for five days at "Crozer" for suicidal ideation in 2008 and outpatient at Chester County Mental Health in 2013.  (R. 454.)  He said he did not benefit from these treatment experiences but medication helped. (*Id.*)  Under "General Family Comments" it was recorded that Plaintiff's mother killed his father when Plaintiff was seven years

old and he witnessed the killing.  (R. 456.)  Plaintiff identified his strengths as family and resiliency, his goal as symptom reduction, and he said he would like to get his barber's license and open a barber shop.  (R. 458.)  Plaintiff agreed to outpatient services, psychiatric evaluation, medication management, and individual therapy.  (R. 459.)

The Mental Status Review conducted on the same date showed the following: Plaintiff was alert and oriented x3; his appearance was neat, clean, and appropriate; his behavior was cooperative; his mood was depressed; his affect was flat; his thought content was appropriate and his thought process logical; his perceptions were appropriate with no auditory or visual problems recorded; his speech was normal; his judgment and insight were fair; his attention and concentration were mildly impaired; his intelligence was estimated to be average and his fund of information was consistent with his background; and his memory was intact.  (R. 460.)  Evaluator Jennifer Tkacz diagnosed Major Depressive Disorder, Recurrent Moderate, Anxiety Disorder NOS, and Polysubstance Dependence.  (R. 461.)  The Integrated Clinical Summary stated that Plaintiff was self-referred due to depression/anxiety, he had no cognitive impairments, his strengths were "Mother/children," his difficulties were "death of a child due to SIDS/Mother killing Father," he aspired to get his barber's license and open a shop, and the treatment goal was to decrease

depression.  (R. 463.)

On August 20, 2013, Plaintiff was seen by Muznay Khawaja, M.D., at the Mercy Health System Adult Ambulatory Clinic in Darby, Pennsylvania, for hypertension and chronic pain starting at the right side of his neck and radiating down to his fingertips.  (R. 428, 566.)  Physical examination included the psychiatric findings that Plaintiff was oriented to time, place, person, and situation and he had appropriate mood and affect.  (R. 429, 567.)  Dr. Khawaja ordered a referral to neurosurgeon Kevin Judy, M.D., for postoperative neck pain, and to Bruce Grossinger, D.O., for pain management.  (R. 568.)  Visits to Mercy Health Partners in September and December 2013 did not indicate any mental health complaints, symptoms, or problems.  (R. 559-65.)

At his Mercy office visit on May 20, 2014, Plaintiff presented with hypertension and neck pain.  (R. 555.)  He was seen by Kaplana Chintha, M.D., who recorded a history of depression and anxiety. (R. 556.)  Plaintiff reported that he used to see a psychiatrist at Chester County and was last seen in 2013.  (*Id.*)  He had been on Xanax and Seroquel and requested to be given those medications again.  (*Id.*)  Dr. Chintha referred Plaintiff to Neil Cohn, M.D. for a psychiatry consultation.  (R. 557.)

On July 14, 2014, Tushar Sarker, M.D., conducted an Initial Evaluation at Mercy Psychiatry Associates.  (R. 497-500.)  Notes from this evaluation are mostly illegible but it appears that Dr.

Sarker observed that Plaintiff was cooperative, with a sad mood, constricted affect, linear thought process and paranoid thought content. (R. 497.)  Dr. Sarker also found that Plaintiff was oriented times three and had fair insight and judgment. (*Id.*)  He diagnosed major depressive disorder with psychotic features, rule out intermittent explosive disorder and bipolar affective disorder. (R. 499.)

On August 14, 2014, Pramod Digamber, M.D., conducted an orthopedic examination at the request of the Bureau of Disability Determination. (R. 503.)  The examination report includes the information that Plaintiff's chief complaints included that he had psychiatric and mental problems. (*Id.*)  Plaintiff reported that "[h]e has anxiety and depression.  He cannot sleep, sees objects, and has wild dreams.  These symptoms he has had for three to four years .  He sees mental health professionals.  He sees a psychiatrist once a month and a therapist once a month." (*Id.*) Plaintiff also said that he had been admitted several times for suicide attempts, including Coatesville in 2012, Reading in 2013, and Chester Hospital in 2014. (*Id.*)

Plaintiff saw Dr. Sarker for medication management on August 19, 2014. (R. 537-38.)  Plaintiff reported that he was still feeling paranoid, the Klonopin did not work, and he wanted to go back on Xanax. (R. 537.)  Mental Assessment showed that Plaintiff's appearance was appropriate, he was fully oriented, his

13

attention and concentration were fair, his speech and motor
behavior were appropriate, his mood was depressed and anxious, his
affect was flat, he reported difficulty falling asleep, he was
cooperative, he had no suicidal ideation, his thought content was
guarded and his thought processes were goal directed, his cognitive
functioning was average, his recent and remote memory were intact,
and his judgment and insight were fair.  (R. 538.)  Dr. Sarker
adjusted Plaintiff's medication regimen and recommended that he
return in four weeks.  (*Id.*)

     On August 20, 2014, Marged Lindner, Ph.D., conducted a
Psychiatric Evaluation.  (R. 520.)  Regarding his psychiatric
history, Plaintiff said he had been hospitalized in Chester in 2009
for a suicide attempt and in 2010 for homicidal ideation and
attempt.  (*Id.*)  He said he had been in psychiatric treatment first
at the Chester Penn Group in Reading and had been treating monthly
with Dr. Sarker since 2013.  (*Id.*)  Plaintiff also reported that he
had been in a therapy group but when he learned that someone in the
group had talked about him outside the group, he "pistol whipped"
the person and refused further group therapy.  (*Id.*)  Regarding
Plaintiff's current functioning, Dr. Lindner recorded that
Plaintiff reported having a good appetite and stated that he
continued to have trouble sleeping but his medication helped his
depressive symptoms and he did not experience anxiety if he took
the medication regularly.  (R. 521.)  Plaintiff denied panic

14

attacks and manic symptoms though he said he continued to hear auditory hallucinations of his name being called, he worried about being attacked, he denied other current paranoid ideation, and he reported difficulty in reading as a cognitive symptom.  (*Id.*) Mental Status Examination showed that Plaintiff was cooperative, he spoke in a low, intense voice, and his overall social skills were adequate.  (*Id.*)  Dr. Lindner noted that Plaintiff was adequately groomed and dressed in long shorts and a singlet with sunglasses and a towel over his head.  (R. 521.)  She stated that his motor behavior was normal, and his eye contact appropriate.  (R. 522.) Dr. Lindner found that Plaintiff's speech was fluent, his voice clear, his expressive and receptive language adequate, his thought processes coherent and goal directed with no evidence of hallucinations or delusions in the evaluation setting, his affect was somewhat restricted, his mood was neutral, he was oriented. (*Id.*)  She also found that Plaintiff's attention and concentration were "mildly impaired in the evaluation setting due to limited intellectual functioning, possibly compounded by medication," and he made errors of simple calculations and serial 3s sequence. (*Id.*)  Dr. Lindner concluded that Plaintiff's recent and remote memory skills were mildly impaired, his cognitive functioning appeared to be below average, his insight was limited, and his judgment was fair.  (*Id.*)  Plaintiff told Dr. Lindner that he was interested in learning to cut hair in order to be more financially

15

independent.  (R. 523.)  Dr. Lindner opined that "the results of
the evaluation appear to be consistent with psychiatric problems
and this may significantly interfere with the claimant's ability to
function on a daily basis."  (*Id.*)  She diagnosed persistent
depressive disorder, unspecified disruptive impulse control and
conduct disorder, and rule out learning disorder.  (R. 523.)

In the Medical Source Statement of Ability to Do Work-Related
Activities (Mental) completed on the same day, Dr. Lindner
indicated that Plaintiff had moderate difficulties in his ability
to understand and remember complex instructions, carry out complex
instructions, and make judgments on complex work-related decisions.
(R. 517.)  These assessments were based on her finding that
learning and concentration were limited due to learning
disabilities and medication side effects.  (*Id.*)  Dr. Lindner found
moderate limitations in Plaintiff's ability to interact
appropriately with the public, and marked difficulty in his ability
to interact appropriately with supervisors and coworkers, and
respond appropriately to usual work situations and to changes in a
routine work setting.  (R. 518.)  By way of explanation, Dr.
Lindner noted that Plaintiff was prone to paranoid ideation.  (*Id.*)

In September 2014, Plaintiff was seen by Geetha Bodapati,
M.D., at Mercy Health System for hypertension and burning
urination.  (R. 550.)  Hypertension, chronic postoperative pain,
and hyperlipidemia were identified in the "Problem List," and

16

Plaintiff's active medications were naproxin, Pepcid and amlodipine.  (R. 550-51.)  Review of Systems indicated no psych findings and physical examination indicated that Plaintiff was oriented to time, place, person, and situation, he had appropriate mood and affect, and his insight and judgment were normal.  (R. 551-52.)  Dr. Bodapati's Assessment/Plan included continuation of amplodipine/losartan for his controlled hypertension, have testing for the dysuria, and a notation that Plaintiff's depression was stable, he was on Remeron/Xanax and was following with a psychiatrist.  (R. 553.)

Plaintiff again saw Dr. Sarker for medication management on October 16, 2014.  (R. 536.)  Hand written notes are largely illegible.  (*Id.*)  However, the printed portion of the form indicates that Plaintiff was well-groomed, he had fair eye contact, cooperative behavior, depressed and anxious mood, constricted affect, guarded thought processes, paranoid thought content, and fair insight and judgment.  (*Id.*)  It appears that Plaintiff was taking Remeron and Xanax at the time with no side effects.  (*Id.*)

At his October 21, 2014, visit to Mercy Health System, Plaintiff had no active complaints and presented to have his driver's license form completed.  (R. 546.)  He was seen by Sandhya Vunnam, M.D.  (*Id.*)  Hypertension, chronic postoperative pain, and hyperlipidemia were again identfied in the "Problem List," and Plaintiff's active medications continued to be naproxin, Pepcid and

17

amlodipine.  (*Id.*)  Review of Systems was negative for anxiety and
depression; physical examination findings included that Plaintiff
was oriented to time, place, person, and situation, he had
appropriate mood and affect, and his insight and judgment were
normal.  (R. 547-48.)

On October 24, 2014, Dr. Sarker completed a Mental Medical
Source Statement.  (R. 530-35.)  As with Dr. Sarker's office notes,
the Medical Source Statement is largely illegible.  He indicated
that he began treating Plaintiff on July 14, 2014, and Plaintiff
had some improvement and was able to control his anger.  (R. 530.)
Medications prescribed were Seroquel, Remeron, and Xanax.  (*Id.*)
It appears that Plaintiff denied side effects from these
medications.  (*Id.*)  Clinical findings demonstrating the severity
of Plaintiff's mental impairment and symptoms include findings that
he was pessimistic, depressed, preoccupied, and paranoid.  (*Id.*)
From the list of signs and symptoms presented, Dr. Sarker checked
that Plaintiff had anhedonia, appetite disturbance with weight
change, decreased energy, impairment in impulse control, mood
disturbance, difficulty thinking or concentrating, psychomotor
agitation and retardation at times, emotional withdrawal or
isolation, easy distractibility, and sleep disturbance.  (R. 531.)
He opined that Plaintiff was seriously limited, unable to meet
competitive standards, or had no useful ability to function in all
mental abilities and aptitudes needed to do unskilled, semiskilled,

or skilled work.  (R. 532-33.)  Dr. Sarker did not provide an explanation for his findings or include the supporting medical/clinical findings which the form requests.  Dr. Sarker also found that Plaintiff was seriously limited or unable to meet competitive standards in all mental abilities and aptitude needed to do particular types of jobs.  (R. 533.)  His explanation for these findings was "Bell's palsy [and] difficult to do [activities of daily living]."  (R. 533.)  He opined that Plaintiff did not have a low IQ or reduced intellectual functioning.  (*Id.*)  In check-the-box format, Dr. Sarker found that the demands of work Plaintiff would find stressful were complexity, deadlines, completing tasks, working with other people, and being criticized by others.  (R. 534.)  He concluded that Plaintiff's impairments would cause him to be absent from work more than four days per month, the impairments had lasted or were expected to last twelve months, and his impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. (R. 534.)

## 3.   **Hearing Testimony**

Plaintiff testified that he was unable to work because the medication he was taking made him feel "like comatose," "[l]ike jittery," and "like in a daze during the whole day."  (R. 50.)  He specifically identified Remeron, Seroquel, and Percocet, stating that he took six Percocets a day for pain which was double what was

prescribed.  (R. 51.)  When asked by the ALJ if anything other than

medication side effects prevented him from working, Plaintiff

talked about numbness in his arms and fingertips, sciatica in his

leg and related pain.  (*Id.*)  Later in the hearing Plaintiff's

attorney asked if there were any aspects of his mental health that

would interfere with his ability to work and Plaintiff identified

medication side effects, specifically jitteriness.  (R. 62.)

**4.   ALJ Decision**

As noted above, ALJ Overton issued her Decision on April 17,

2015.  (R. 21-32.)  She made the following Findings of Fact and

Conclusions of Law:

> 1.   The claimant meets the insured status
>      requirement of the Social Security Act
>      through December 31, 2014.
>
> 2.   The claimant has not engaged in
>      substantial gainful activity since June
>      13, 2012, the alleged onset date (20 CFR
>      404.1571 et seq., and 416.971 et seq.).
>
> 3.   The claimant has the following severe
>      impairments: post-laminectomy syndrome;
>      depression; marijuana abuse (20 CFR
>      404.1520(c) and 416.920(c)).
>
> 4.   The claimant does not have an impairment
>      or combination of impairments that meets
>      or medically equals the severity of one
>      of the listed impairment in 20 CFR Part
>      404, Subpart P, Appendix 1 (20 CFR
>      404.1520(d), 404.1525, 404.1526,
>      416.920(d), 416.925 and 416.926).
>
> 5.   After careful consideration of the
>      entire record, the undersigned finds
>      that the claimant has the residual
>      functional capacity to perform light

20

work as defined in 20 CFR 404.1567(b) and 416.967(b) except would never climb ladders, ropes or scaffolds; no more than occasional climbing of ramps or stairs; no more than occasional stooping, balancing, kneeling, crouching or crawling; should avoid concentrated exposure to extreme cold or heat, excessive vibration, operational control of moving machinery or hazardous machinery; should be in a low stress job, defined as having only occasional decision making changes in the work setting or judgment required on the job; should have a job which did not require interaction with the public and only brief and superficial contact with supervisors and co-workers would be required.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on August 20, 1967 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

21

national economy that the claimant can
perform (20 CFR 404.1569, 404.1569(a),
416.969, and 416.969(a)).

11. The claimant has not been under a
disability, as defined in the Social
Security Act, from June 13, 2012,
through the date of this decision (20
CFR 404.1520(g) and 416.920(g)).

(R. 23-32.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[2] It is necessary for the
Commissioner to ascertain: 1) whether the applicant is engaged in a
substantial activity; 2) whether the applicant is severely
impaired; 3) whether the impairment matches or is equal to the
requirements of one of the listed impairments, whereby he qualifies

---

[2] "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

only if his physical or mental impairment or
impairments are of such severity that he is not
only unable to do his previous work but cannot,
considering his age, education, and work
experience, engage in any other kind of
substantial gainful work which exists in the
national economy, regardless of whether such
work exists in the immediate area in which he
lives, or whether a specific job vacancy exists
for him, or whether he would be hired if he
applied for work.

42 U.S.C. § 423(d)(2)(A).

for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs which existed in significant numbers in the national economy. (R. 31-32.)

### III. Standard of Review

23

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to

24

analyze all evidence.  If she has not done so and has not
sufficiently explained the weight given to all probative exhibits,
"to say that [the] decision is supported by substantial evidence
approaches an abdication of the court's duty to scrutinize the
record as a whole to determine whether the conclusions reached are
rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.
1979).  In *Cotter*, the Circuit Court clarified that the ALJ must
not only state the evidence considered which supports the result
but also indicate what evidence was rejected: "Since it is apparent
that the ALJ cannot reject evidence for no reason or the wrong
reason, an explanation from the ALJ of the reason why probative
evidence has been rejected is required so that a reviewing court
can determine whether the reasons for rejection were improper."
*Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an
exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v.
Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement
that the ALJ discuss in its opinion every tidbit of evidence
included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d
Cir. 2004).  "[W]here [a reviewing court] can determine that there
is substantial evidence supporting the Commissioner's decision, . .
. the *Cotter* doctrine is not implicated." *Hernandez v. Comm'f of
Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not
precedential).

A reviewing court may not set aside the Commissioner's final

decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be reversed or remanded for the following reasons: 1) the

ALJ improperly discounted opinions by treating and examining physicians and gave undue weight to opinions by a non-examining reviewer; 2) the ALJ failed to consider evidence of impairment; and 3) the ALJ's RFC assessment and hypothetical question to the vocational expert did not include all of the limitations established by the evidence and, therefore, her conclusion that there is work Plaintiff can do is not supported by substantial evidence.  (Doc. 12 at 1.)

**A.   *Weighing of Medical Opinions***

Plaintiff contends "the ALJ erred in discounting the opinions of Drs. Sarker, Bryer and Lindner which were well supported and consistent with each other and other evidence, and instead giving great weigh to the opinions of the non-examining reviewer, Dr. Hite." (Doc. 12 at 11.)  Specifically, Plaintiff asserts that ALJ Overton did not discuss probative evidence supporting each of these opinions and improperly discounted them in part because they were not consistent with Plaintiff's RFC.  (Doc. 12 at 9-11.)  Defendant acknowledges that reference to the RFC did not provide an evidentiary basis to discount the opinions but argues the ALJ set out adequate reasons with evidentiary support as to why she discounted or accepted the opinions.  (Doc. 13 at 14.)  The Court concludes remand is warranted for reconsideration of the opinions at issue.

Under applicable regulations and the law of the Third Circuit,

a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). This principal is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[3] "A

---

[3] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Similarly, greater deference is due an examining source than a non-examining source. 20 C.F.R. § 404.1527(c)(1). Section 404.1527(c)(3) provides the following:

> evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> The more a medical source presents relevant
> evidence to support an opinion, particularly
> medical signs and laboratory findings, the
> more weight we will give that opinion.  The
> better an explanation a source provides for
> an opinion, the more weight we will give that
> opinion. Furthermore, because nonexamining
> sources have no examining or treating
> relationship with you, the weight we will
> give their opinions will depend on the degree
> to which they provide supporting explanations
> for their opinions. We will evaluate the
> degree to which these opinions consider all
> of the pertinent evidence in your claim,
> including opinions of treating and other
> examining sources.

*Id.*

As set out previously, it is the ALJ's duty not only to state the evidence considered which supports the result but also to indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  A thorough explanation of the evidence relied upon by the ALJ in discounting a medical source opinion takes on added significance in a case involving severe mental impairment in that the Third Circuit has advised that "[t]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving mental disability." *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). In the case of mental health impairments, it is recognized that a

medical source's opinion which relies on subjective complaints should not necessarily be undermined because psychological and psychiatric conditions are necessarily and largely diagnosed on the basis of a patient's subjective complaints.  *Schickel v. Colvin*, No. 14 C 5763, 2015 WL 8481964, at *11 (N.D. Ill. Dec. 10, 2015); *Hall v. Astrue*, 882 F. Supp. 2d 732, 740 (D. Del. 2012).

Here treating provider evidence supporting Plaintiff's claimed mental health impairments is very thin.  Treatment records are sparse and complaints to primary care providers about mental health problems are almost nonexistent.  The summary of mental health evidence shows that, aside from the disability evaluation records from consulting examining sources Dr. Bryer and Dr. Lindner, the only mental health evaluations/treatment records during the relevant time period are the NHS August 2013 evaluation records (R. 453-66), Dr. Sarker's initial evaluation on July 2014, two follow-up medication checks in August and September 2014, and Dr. Sarker's October 2014 Mental Medical Source Statement ((R. 497-500, 530-35, 536, 537-38).  The review also shows that, for the most part, Plaintiff does not mention any mental health related problems to primary care providers and is not observed by them to have such problems but contemporaneous mental health evaluations portray an individual with multiple serious limitations.[4]

---

[4] As reviewed in the Background section of this Memorandum, Plaintiff had at least fourteen visits with primary care providers from June 5, 2012, through the date of the decision.  Mental health

Despite this discrepancy, the Court cannot concur with
Defendant that the ALJ set out adequate reasons with evidentiary
support as to why she discounted or accepted the opinions (Doc. 13
at 14).  First, the Court agrees with Plaintiff that ALJ Overton
did not discuss probative evidence supportive of the opinions of
Dr. Bryer, Dr. Lindner, and Dr. Sarker.  (Doc. 12 at 9-11.)
Although Defendant correctly asserts that "an ALJ 'need not mention
every piece of evidence in the record,'" (Doc. 13 at 15 (citing
*Beety-Monticelli v. Comm'r of Soc. Sec.*, 343 F. App'x 743, 747 (3d
Cir. 2009))), "an explanation from the ALJ of the reason why
*probative* evidence has been rejected is required so that a
reviewing court can determine whether the reasons for rejection
were improper."  *Cotter*, 642 F.2d at 706-07 (emphasis added).[5]

---

related matters were either not mentioned or explicitly found to be
normal on both Review of Systems and examination.  On only three
occasions were mental health issues noted at primary care visits
during the relevant time period—first in January 2013 where,
without explanation or background information, "psychiatric
disorder" was noted to be a problem (R. 443-45); second in May 2014
when he told his primary care provider that he had been on Xanax
and Seroquel, requested to be given those medications again, and
was referred for a psychiatry consultation (R. 557); and for the
third time in September 2014 when the primary care provider noted
that Plaintiff's depression was stable, he was taking Remeron and
Xanax, and he was being seen by a psychiatrist (R. 553).

    [5]  In *Beety-Monticelli*, the quoted language addressed a
situation where a plaintiff alleged that the ALJ erred in not
discussing certain evidence of record and the Circuit Court found
no error in that the evidence concerned a condition which supported
the ALJ's conclusion that Plaintiff suffered a severe impairment,
but the existence of the condition—which was successfully treated
and did not recur—did not undermine the ALJ's determination that
Plaintiff retained sufficient RFC to perform past relevant work.

Here Plaintiff properly points to observations made by examining sources which can be considered supportive of their opinions yet the ALJ does not acknowledge or discuss them.  (Doc. 12 at 9-11.)  For example, the ALJ did not consider Dr. Bryer's findings of paranoia, significantly disrupted memory, poor impulse control and suspected cognitive impairment (*see* Doc. 12 at 10 (citing R. 29, 422-23)); she did not consider Dr. Sarker's observations of Plaintiff's sad/depressed mood, constricted affect, and paranoid thought content (*see* Doc. 12 at 9 (citing R. 497)); and she did not consider Dr. Lindner's observations of Plaintiff's restricted affect, impaired attention and concentration, impaired memory and below average cognitive function (*see* Doc. 12 at 11 (citing R. 520-21)).

     Defendant avers that "remand is only necessary if the ALJ's decision des not allow for meaningful judicial review and there was no adequate reason[] for discounting or accepting medical opinions."  (Doc. 13 at 13 (citing *Ryman v. Colvin*, No. 15-52, 2016 WL 6039144, at *9 (M.D. Pa. Oct. 14, 2016)).)  Here the ALJ's failure to discuss probative evidence is not offset by the reasons provided for discounting or accepting opinions.  Unlike in *Ryman* where this Court determined that the ALJ provided several reasons

---

*Id.* at 747-48.  The situation here is distinguishable in that the Court cannot conclude that the probative evidence cited by Plaintiff does not undermine the ALJ's determination regarding the weight afforded opinions.

for assigning little weight to an opinion and, thus, one basis shown to be inadequate was not cause for remand, 2016 WL 6039144, at *9 (citing *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004); *Burnett*, 220 F.3d at 119)), here ALJ Overton cites several inadequate reasons.  Eliminating the RFC basis of support for her assessments which Defendant agrees is inappropriate, ALJ Overton basically relies on general averments of consistency or inconsistency with the available medical evidence. (*See* R. 29-30.) With few exceptions, she does so without specific citations to the record.  (*Id.*)  Particularly given the relatively consistent opinions regarding Plaintiff's mental health provided by examining medical sources, ALJ Overton's general citation to exhibits of record is not adequate evidentiary support for her conclusions. *See*, *e.g.*, *Gross v. Comm'r of Soc. Sec.*, 653 F. App'x 116, 121-22 (3d Cir. 2016) (not precedential).

In addition to RFC and medical evidence inconsistency, ALJ Overton also criticized Dr. Bryer's opinion because it appeared to have been based on Plaintiff's subjective complaints, it was inconsistent with his finding that Plaintiff manifested appropriate social graces, and it did not cover most of the period of disability. (R. 29.)  As noted above, in the case of mental health impairments, reliance on subjective complaints should not necessarily be undermined because psychological and psychiatric conditions are necessarily and largely diagnosed on the basis of a

patient's subjective complaints.  *Schickel*, 2015 WL 8481964, at *11; *Hall*, 882 F. Supp. 2d at 740.  ALJ Overton does not explain how appropriate social graces in the clinical examination setting are contradictory to findings regarding a claimant's work-related abilities.  Because courts recognize that the work environment and home or mental health clinic environment can be completely different for a person suffering from a mental impairment marked by anxiety, *Morales*, 225 F.3d at 319, more is required for the ALJ's perceived contradiction to be credited as a valid basis to undermine an opinion.  Finally, in weighing an opinion, an ALJ may consider the date it was rendered as it relates to the medical evidence during the relevant time period, *see Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  However, as discussed more fully below, such a consideration must be applied consistently or with meaningful distinctions explicated.

ALJ Overton specifically criticized Dr. Lindner's opinion because "she apparently relied upon a diagnosis of learning disability that is not supported by the rest of the medical evidence."  (R. 29 (citing "e.g. B11F/8").)  The supporting citation does not show or infer that Dr. Lindner relied on a diagnosis of learning disability and the ALJ did not explain her conclusion.  Therefore, ALJ Overton has provided no valid basis to undermine Dr. Lindner's opinion.

Criticism of Dr. Sarker's opinion beyond the RFC and medical

evidence bases discussed above is more specific: Dr. Sarker opined
that Plaintiff had serous limitations with using public
transportation yet he used public transportation to attend the
hearing and testified that he had no related problems; and Dr.
Sarker had seen Plaintiff only twice before he issued his opinion.
(R. 30.)  While the inconsistency regarding public transportation
is accurate, one identified inconsistency out of twenty-five rated
categories in the Mental Medical Source Statement (R. 532-33)
cannot be considered substantial evidence supporting the ALJ's
assessment of the opinion.  Finally, the ALJ mistakenly noted that
Dr. Sarker had seen Plaintiff only twice--the record shows that he
had seen Plaintiff for an evaluation in July 2014 (R. 497-500), for
medication management in August 2014 (R. 537-38), and again for
medication management on October 16, 2014 (R. 536).  The Court
agrees with Defendant that ALJ Overton is commenting on the limited
nature of Dr. Sarker's treatment.  (*See* Doc. 13 at 15 n.4.)
However, to the extent Defendant infers that this error is
insignificant, treatment and evaluation over a three-month period
with multiple opportunities to observe and evaluate the
effectiveness of the prescribed medication regimen arguably
provides a more broad base for evaluation than one opportunity to
do so following the initial evaluation and treatment plan
implementation.  (*See* R. 497-500, 536, 537-38.)  Further,
undermining a treating source based on the amount of contact loses

36

some force where great weight was assigned to a non-examining source.

Though Defendant cites more specific evidence and provides reasons for supporting the ALJ's opinion assessments (Doc. 13 at 15-21), Defendant cannot provide *post hoc* reasons for supporting the ALJ's decision.  It is the ALJ's responsibility to explicitly provide reasons for his decision; analysis later provided by Defendant cannot make up for the analysis lacking in the ALJ's decision.  *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Dobrowolsky*, 606 F.2d at 406-07.

Given the previously discussed scant evidence of ongoing mental health symptoms during the relevant time period, the shortcomings concerning the ALJ's analysis of the fairly consistent examining sources' opinions could be offset by reasonable reliance on a medical source's countering opinion.  In other words, if Dr. Hite's opinion could be considered substantial evidence supporting the ALJ's determination that Plaintiff did not have the limitations found by Drs. Bryer, Lindner, and Sarker, remand may not be warranted.  Thus, the Court must consider whether ALJ Overton properly attributed great weight to Dr. Hite's opinion (R. 29).

ALJ Overton noted that Dr. Hite found that Plaintiff had some moderate limitations with regard to getting along with the general public, co-workers, and supervisors and also opined that Plaintiff was able to maintain attention and concentration for extended

periods to attend to simple and routine tasks.  (R. 29 (citing Ex. B1A/9).)  He assigned the opinions great weight because they were "consistent with the claimant's residual functional capacity and the available medical evidence (e.g. B3F; B11F; B17F, B21F)."  (R. 29.)  As discussed above, the RFC basis for the conclusion is inappropriate.  The "available medical evidence" cited by example runs afoul of the *Gross* principle that general citation to exhibits of record does not provide sufficient support for an assessment. 653 F. App'x at 121-22.  A further problem with assigning the opinion great weight is that it was rendered just a week after Dr. Bryer's opinion and ALJ Overton discounted Dr. Bryer's opinion in part because it was from December 2012 and did "not cover most of the period of disability being alleged by the claimant."  (R. 29.) While ordinarily reliance on an earlier state agency opinion is not problematic unless evidence shows that the plaintiff's condition changed significantly after the opinion was rendered, *Chandler*, 667 F.3d at 361 (3d Cir. 2011), here the lack of even-handed treatment of contradictory opinions is troublesome.  This is particularly so in the case of favorable treatment of a non-examining source where the issue is mental health in that *Morales* emphasized the importance of proper consideration of medical source opinions in cases involving mental disability, 225 F.3d at 319.

While there may be reasons for discounting the opinions of Drs. Sarker, Bryer and Lindner, the Court concludes the ALJ did not

provide an adequate basis for doing so in that some reasons provided were inappropriate or not properly supported and she did not discuss probative evidence supportive of the opinions. Further, ALJ Overton did not provide adequate reasons for assigning great weight to the reviewing source. Therefore, remand is required for reconsideration/further explanation of the medical source opinions.

**B.   *Evidentiary Review***

As well as the failure to review probative evidence related to his mental health, Plaintiff asserts that ALJ Overton also failed to mention multiple objective findings that support his claimed physical impairments. (Doc. 12 at 16.) Defendant responds that the ALJ adequately summarized the evidence given that an ALJ "'need not mention every piece of evidence in the record.'" (Doc. 13 at 23 (citing *Beety-Monticelli*, 343 F. App'x at 747).) As discussed above, the context here is distinguishable from *Beety-Monticelli*. Because remand is required for reconsideration of medical source opinions, including a review of probative evidence supporting the examining source opinions, evidence probative of Plaintiff's alleged physical limitations should also be reviewed.

**C.   *RFC Assessment***

Plaintiff argues that the RFC and hypothetical questions to the VE do not include all of the limitations established by the evidence, specifically the moderate difficulties in concentration,

persistence, or pace recognized by the ALJ.  (Doc. 12 at 13-14 (citing R. 25, 26, 78).)  Defendant responds that substantial evidence supports the RFC assessment because the ALJ provided RFC limitations sufficient to address the concentration, persistence, or pace limitations.  (Doc. 13 at 23-25.)  In making this argument, Defendant cites district court cases where the RFC did more than limit the claimant to simple work and courts found that the RFC limitations accounted for acknowledged difficulties in concentration, persistence or pace.  (*Id.* (citing *Wright v. Colvin*, No. 15-102, 2015 WL 4530384, at *16-17 (M.D. Pa. July 27, 2015); *Kutzer v. Colvin*, No. 13-1774, 2014 WL 4796366, at *19-20 (M.D. Pa. Sept. 26, 2014); *Pimental v. Colvin*, No. 15-2662, 2016 WL 3456919, at *11-13 (D.N.J. July 15, 2014); *Pettigrew v. Colvin*, No. 14-42, 2014 WL 4792196, at *7 (W.D. Pa. Sept. 24, 2014)).)  Defendant also cites *Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014), for the proposition that an RFC limiting the claimant to simple, routine work was adequate notwithstanding moderate limitations in concentration, persistence, or pace where the evidence reasonably supported the ALJ's analysis.  (Doc. 13 at 25-26.)

With these arguments, Defendant acknowledges that here the RFC did not contain a limitation to simple, routine, and repetitive work, but Defendant asserts the Court should consider this limitation as part of the RFC in light of the vocational expert's

40

testimony and the ALJ's step five finding.  (Doc. 13 at 25 n.6
(citing R. 31-32, 77-78).)  Rather than make the inferences
suggested, the Court concludes that, because remand is required for
reconsideration of opinion evidence and a more thorough review of
evidence, the ALJ's recognition of concentration, persistence, or
pace limitations should be better accounted for in the RFC.

### V. Conclusion

For the reasons discussed above, Plaintiff's appeal is
properly granted and this matter is remanded to the Acting
Commissioner for further consideration.  An appropriate Order is
filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: December 12, 2016